# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

*vs.*                                                      **CRIMINAL ACTION NO. 2:12cr11**

**AMANDA LIPSCOMB and**
**LARRY MARTIN,**

      **Defendants.**

## REPORT AND RECOMMENDATION/OPINION

On June 25, 2012, Defendant Lipscomb, through counsel, filed a "Motion to File a Motion Beyond the Date Set Forth in the Initial Scheduling Order" [Docket Entry 32], which was granted by Chief District Judge John P. Bailey, and a "Motion to Suppress" [Docket Entry 33]. Co-defendant Martin, through his counsel, filed a Motion to join in Lipscomb's Motions on June 26, 2012 [Docket Entry 34], which was also granted by Chief District Judge Bailey. The United States filed a Response and Objection to the Motion to Suppress on June 29, 2012 [Docket Entry 39].

On July 2, 2012, came Defendant Lipscomb in person and through counsel, L. Richard Walker, and Defendant Martin in person and through counsel, Lary Garrett, for hearing on the "Motion to Suppress." The United States appeared through its Assistant United States Attorney, Stephen Warner.

## I. Procedural History

Defendants were indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on March 20, 2012. The indictment charges both defendants in a Methamphetamine Conspiracy (Count One), Manufacturing Methamphetamine – aiding and abetting (Count Two), Possession of Materials used in the Manufacture of Methamphetamine – Aiding and Abetting (Count Three), and Maintaining a Drug–Involved Premises – Aiding and

Abetting (Count Four). The indictment further charges Martin separately in five counts of Possession of Pseudoephedrine to be used in the Manufacture of Methamphetamine (Counts Five Through Nine), and charges Lipscomb separately in three counts of Possession of Pseudoephedrine to be used in the Manufacture of Methamphetamine (Counts Ten through Twelve).

Defendants appeared before the Court for an arraignment on April 9, 2012, at which time both entered pleas of "Not Guilty" to all counts.

## II. Contentions of the Parties

Defendant contends:

1. The terms of Attachment A to the application for the search warrant, relating to the property to be seized, are overly broad, authorizing officers to search for "[a]ny and all material evidence of a crime," thereby calling for and causing a generalized, limitless search.

2. The police exceeded the scope of the search warrant, by examining paperwork within the home not relating to financial instruments, or indicia of occupancy and/or ownership, which is all Attachment A authorized in a particular way.

3. The officers executed the search in an unreasonable manner by: 1) shooting and killing Defendant's dog; 2) entering the residence of a neighbor who was not a target in the case, and conducting an illegal, warrantless search of his residence; 3) threatening that neighbor (Defendant's brother) with arrest unless he provided incriminating information about Defendant; and 4) collecting information from the neighbor's cell phone without his permission, that the Government intends to use against Defendants at trial.

The United States contends:

1. The warrant was not overbroad.

2. Officers did not exceed the scope of the warrant by seizing the methamphetamine

manufacturing instruction sheet.

3. The dog that was killed aggressively ran toward the officers and the officers acted reasonably in shooting the dog.

4. Neither defendant has standing to complain of any of the officers' activities at the neighbor's residence.

### III. Statement of Facts.

The undersigned heard the sworn testimony of West Virginia State Trooper Charles Kessel, Grant County Deputy Kirk Thorne, Defendant Lipscomb's sister, Jessica Lipscomb, and Defendant Lipscomb's brother, Eric Lipscomb, and admitted into evidence Government Exhibits 1 through 6 without objection.

The undersigned finds the following facts based on the exhibits in evidence, the memoranda of counsel, the Search Warrant, Affidavit in Support and Return, and the testimony.

As part of an ongoing investigation into rural methamphetamine production in West Virginia, several confidential informants allegedly provided statements to police which incriminate Defendants. Based upon these alleged statements, surveillance, and pharmacy records, police executed a search warrant issued on September 7, 2011, for Defendants' residence in Moorefield, West Virginia.

Attachment A to the Search Warrant, entitled "PROPERTY TO BE SEIZED," states as follows:

> Controlled substances (In particularly [sic], but not limited to, Methamphetamine); Photographs of controlled substances and/or co-conspirators; Paraphernalia for packaging, cutting, weighing and/or distributing controlled substances (including but not limited to scales and baggies); Tools (including but not limited to: plastic and/or glass bottles, beakers, plastic tubing, coffee filters, air pumps), supplies, ingredients (including but not limited to: drain cleaner/opener, Coleman fuel or solvent, cold packs, lithium batteries, salt, lye, pseudoephedrine) and/or instruments used in the manufacturing or cultivation of a controlled substance; Any and all handguns, rifles,

shotguns, submachine guns, assault rifles or any other firearms found which may be used to facilitate transactions in controlled substances or computers relating to the manufacturing, transporting, ordering, purchasing or distribution of a controlled substance; United States currency, precious metals, jewelry, and financial instruments, including but not limited to, stocks and bonds which may be used in the sale and/or profit of a controlled substance; Indicia of occupancy [sic], and/or ownership of the premise described above, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys; Any and all material evidence of a crime.

The warrant was issued by Hardy County magistrate Shawna M. Crites on September 7, 2011. It was executed the same day at about 9:00 p.m. Approximately five officers were involved in the search. Trooper Nazelrod and two others went to the rear of the residence. They knocked, and, receiving no response, breached the door, which Jessica Lipscomb said was unlocked. Her sister, Defendant Lipscomb, and Defendant Martin were not home. She had been staying with them for about ten days after having a fight with her boyfriend. She was lying on the couch, sleeping, before going to her night shift work. She was sleepy because she had been sneaking around to see her boyfriend against whom she had a "domestic" against. She heard the dog barking and thought her sister and Martin were coming home, but did not see what happened next. She heard a gunshot.

One of the officers had shot the dog. There may have been a second shot, but none of the witnesses appearing saw or heard what happened. Ms. Lipscomb testified the officers talked about killing the dog after the first shot. The animal was, according to the officers and Ms. Lipscomb, a large brown and white pit bull, which, as she testified "some may see where it might been an aggressive bark."

The officers searched the residence, a horse trailer, an outbuilding behind the trailer, and a white trailer they believed was part of the property and unoccupied, but which they found out later was occupied by Eric Lipscomb. The white trailer was described in the Attachment to the Arrest

4

Warrant indicating property to be searched. It had black plastic bags over the windows, appeared to be unkempt, and Tpr. Kessel had seen no cars or people there on several trips past the area. The white trailer was within feet of the Martin residence. The horse trailer and outbuilding were much further away. Trooper Kessel testified he had called 911 seeking an address for the white trailer, but 911 said there was no separate address, although there was an address for the Martin residence.

Neither Tpr. Kessel nor Deputy Thorne knew there was a dog at the residence, the only clue being that there was a sign that said "Beware of the Dog" on the fence outside the house. Neither heard barking. Their training regarding dangerous animals was the same as for any threat – It depended on the distance of the officer from the threat, if there was the possibility of retreat, and if there was time to use a different method than shooting. Tpr. Kessel testified the officer showed him the dog had been only 3-4 feet from him when he shot it.

Deputy Thorne had searched the bedroom in the Martin residence. It was he who found the three-page document "How to Make Methamphetamine." He found it in a dresser drawer in the bedroom. It was folded so that it appeared "puffy," and there was no text on the outside. He and Tpr. Kessel both testified consistently that when the search is for a clandestine lab, officers look in drawers and other smaller areas because a majority of the items used to manufacture methamphetamine can be found in such places– Sudafed, lye, tubing, salt, batteries, or controlled substances, for example. They also are trained to look for, and the warrant expressly authorized the seizure of currency, bonds, and paperwork that might be indicia of property ownership. Both also testified that sometimes crushed pills or drugs are found in folded papers.

Trooper Kessel testified that all of the items seized were relevant to the manufacture of methamphetamine. He himself had written the Affidavit and attachments, and had included the

language: "And any and all material evidence of a crime" at the conclusion. He testified he had used that language before, even while in training, supervised by a superior officer.

Eric Lipscomb testified that he was sleeping in the adjacent white trailer when an officer entered and held a gun to him. The officer asked him where "Wolfman" was (an alias for Defendant Martin), and he said he did not know. The officer went through the trailer quickly, took him out of the trailer and put him in the K-9 Unit vehicle until Tpr. Kessel arrived and let him go back to his trailer. According to Lipscomb, he did not consent to any search, and he did not consent to the officers looking through his cell phones, but they did, anyway. According to Tpr. Kessel, he asked Lipscomb if he could see his cell phones and Lipscomb handed them to him. He was admittedly inside the doorway at the time. On one cell were some texts to and from someone named "Amanda" which the Government intends to use at trial.

### IV. Discussion

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980)( quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972)). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961).

The Fourth Amendment to the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and

seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

### A. Probable Cause

Defendants do not argue that the search warrant was unsupported by probable cause. Further, the Court finds there is probable cause as stated in the affidavit to support the issuance of the search warrant by magistrate Crites.

### B. Particularity Requirement

Defendant contends that the terms of Attachment A are overly broad. A valid search warrant under the Fourth Amendment must "particularly describe the place to be searched, and the persons or things to be seized." U.S. v. Robinson, 275 F.3d 371 (4th Cir. 2001). The particularity requirement protects against "a general, exploratory rummaging in a person's belongings" to the extent that a valid warrant leaves nothing to the discretion of the officers performing the search. Id. Although conceding that Attachment A includes "some particular language," Defendant argues that the last sentence, authorizing police to search for "[a]ny and all material evidence of a crime," is overly broad and would authorize "a general exploratory rummaging in a person's belongings."

The Court first notes that, with the exception of that last sentence, the list of items to be seized appears almost overly particular: For example, "Any and all handguns, rifles, shotguns, submachine guns, assault rifles or any other firearms found which may be used to facilitate transactions in controlled substances."

The Court finds that the sentence "Any and all material evidence of a crime" by itself is overly broad and could be seen as authorizing a general exploratory rummaging in a person's

7

belongings." The Court also finds, however, that the inclusion of that one sentence does not invalidate the entire search warrant. In fact, Defendants do not point to any materials that were seized that would not be covered by the particular terms of the search warrant, with the exception of the methamphetamine instruction sheet, which shall be discussed later. See United States v. Washington, 852 F.2d 803 (4th Cir. 1088) (upholding a warrant which authorized a search for "heroin, a quantity of drug paraphernalia, papers, notes, bank records, identification documents and other items of evidence...."), and United States v. Dickerson, 166 F.3d 667 (4th Cir. 1999)(upholding a warrant that was claimed overbroad, noting, expressly, the fact that the items actually seized were all related to the crime at issue.) Tpr. Kessel testified all the items on the property receipt were related to the manufacture of methamphetamine, and a review of the Property receipt indicates to the Court that his testimony regarding this was correct.

The Court therefore finds the warrant itself is not invalid due to overbreadth, and that, in the alternative, even if the last sentence is considered to be overbroad, no evidence was seized that was unrelated to the manufacture of methamphetamine, and therefore, that sentence could be excised from the search warrant, still leaving the remaining warrant valid. See, e.g., Eckstein v. Melson, 18 F.3d 118, fn. 8 (4th Cir. 1994)("we noted that the section of the search warrant executed by the FBI agents on April 24, 1992, which encompassed those books was declared "impermissibly overbroad" by the court below. *Eckstein,* 803 F.Supp. At 1115. The portion of the warrant held valid by Judge Ellis dealt only with magazines of the type mentions *supra* at note 3.") See also U.S. v. Ross, 2009 WL 688809 (N.D.W.Va. 2009), which cites with approval United States v. Jacob, 657 F.2d49 (4th Cir. 1981) the following holding:

The general "tail" of the search warrant will not be construed so as to defeat the

> particularity of the warrant . . . In our opinion it is this particularity which, if present, will not be defeated by ambiguous conclusionary language. While a sufficiently particular qualifying phrase may have the effect of bringing an otherwise "general" warrant within the constitutional standard, a defective qualifying phrase will not defeat a warrant which is otherwise sufficiently specific . . . We are further of the opinion that the challenged phrase should properly be treated as merely superfluous . . . accordingly, we hold that it was error for the district court to suppress all of the evidence obtained under the warrant.

In accordance with Jacob, the Fourth Circuit in Ross found the broad concluding phrase, "and any other evidence of a crime" "will not serve to invalidate the remaining sufficiently specific warrant."

**C. Exceeding Scope of Warrant**

Defendant next contends the police exceeded the scope of the otherwise legitimate search warrant provisions. Specifically, that officers examined paperwork within Defendants' home not relating to financial instruments or indicia of occupancy and/or ownership, which is all Attachment A authorized in a particular way. In the process, the officers - - without lawful authority - - located, examined and seized an alleged instruction apparently downloaded off the Internet, describing a method to produce methamphetamine.

The United States argues that the seizure of the methamphetamine manufacture instruction sheet did not exceed the scope of the warrant because the warrant directed officers to search for evidence of "financial instruments," "indicia of occupancy, and/or ownership of the premises," and "various small items used in the manufacture of methamphetamine," all of which could well have been in the location where the instruction sheet was found. The warrant also authorized the officers to search for "computers relating to the manufacturing . . . of a controlled substance," and the particular instruction sheet at issue contains a web site address at the bottom, "such that it obviously was downloaded from the internet using a computer."

The undersigned finds the seizure of the document entitled "How to make Methamphetamine" did not exceed the scope of the warrant because it was found during a proper search for items that may be used in the manufacture of methamphetamine that might be in a drawer or other small space. Further, the search warrant expressly identified certain documentary-type evidence, such as indicia of ownership, which could reasonably have been in a bedroom drawer. Also the folded paper could, as officers testified, have contained money or even crushed pills or drugs. Moreover, the document in question was folded such that no identifying writing appeared on the outside to the casual observer. The officer could not know in advance of unfolding the paper whether it contained drugs, whether it was a copy of a household bill that would show indicia of occupancy and/or ownership, or instructions on how to make methamphetamine.

### D. The Shooting of the Dog

Defendant argues the officers executed the search warrant in an unreasonable manner. First, Defendants claim that "[i]mmediately upon arriving ... the police officers shot and killed the Defendant's dog, which was not an aggressive animal." The United States argues that the so-called "non aggressive" dog was an adult pit bull. Further, the residence has a sign posted stating "Beware of Dog." The United States argues that when the officers arrived, they knocked and announced, but no one responded, although there was a person in the residence. Officers then breached the door with guns drawn, at which time the dog "Immediately and aggressively ran toward the officer" and WV State Trooper Nazelrod shot the dog.

Jessica Lipscomb testified that the dog was a large pit bull and its barking could be seen as threatening. More importantly, however, neither the defendants nor the United States suggest to the Court how, even if the shooting of the dog were found to be unreasonable, this would effect the

admissibility of the evidence seized pursuant to a valid search warrant.

### E. Standing to Address the Search of the Neighbor's Residence

Defendants next argue the unreasonableness of the execution of the search warrant, stating:

> Thereafter, the police entered the residence of a neighbor - - who was not a target in this case - - and conducted an illegal, warrantless search of his residence. That individual is Defendant's brother. He was held at gunpoint. Officers detained him during the course of the search. Officers threatened him with an arrest, unless he provided incriminating information about the Defendant and/or Mr. Martin. Without permission, the police collected information from his cell phone that it now intends to use against Defendant at trial.

The United States argues that neither defendant has standing to complain of any police activity at their neighbor's residence.

To challenge a search successfully under the Fourth Amendment a <u>defendant</u> must have "a reasonable expectation of privacy" in the place that was searched. <u>Rakas v. Illinois</u>, 439 U.S. 128 (1978). "Fourth Amendment rights are . . . personal rights," which co-defendants "lack standing to assert vicariously." <u>United States v. Taylor</u>, 857 F.2d 210 (4th Cir. 1988). While a person "may have a legitimate expectation of privacy in the house of someone else," none of the evidence or testimony suggests the defendants are even arguing an expectation of privacy in Eric Lipscomb's residence. <u>Minnesota v. Carter</u>, 525 U.S. 83 (1998).

The undersigned finds Defendants have no standing to assert any Fourth Amendment rights regarding the alleged search of their neighbor's home.

### V. CONCLUSION

Upon consideration of all of the above, the undersigned United States Magistrate Judge finds all the evidence seized by the police in the above case is admissible and therefore **RECOMMENDS**

the Motion to Suppress be **DENIED**.

## VI.  RECOMMENDATION

Inasmuch as an order denying defendant's motion to suppress may be tantamount to a dispositive motion, it is the **RECOMMENDATION** of the undersigned Magistrate Judge that Defendants' Motion to Suppress (Docket Entry 33) be **DENIED.**

Any party may, within fourteen (14) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation for Disposition to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge.  Failure to timely file objections to the Report and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 3rd day of July, 2012.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE